1975

The STATE, Respondent v. Ronald WHITE, Appellant.

(428 S.E. (2d) 740)

Court of Appeals

*Olin L. Purvis, III,* Darlington, *for appellant.*

*Atty Gen. T. Travis Medlock, Chief Deputy Atty Gen. Don-*

*ald J. Zelenka, Asst. Attys. Gen. Harold M. Coombs, Jr.*, and *Norman Mark Rapoport,* Columbia, and *Sol. Dudley Saleeby, Jr.,* Florence, *for respondent.*

Heard Feb. 17, 1993; Decided March 22, 1993.

Reh. Den. April 22, 1993.

GOOLSBY, Judge:

Ronald White appeals his conviction for felony driving under the influence and his sentence of twenty-one years imprisonment. The questions on appeal concern the trial judge's failure to grant a motion for continuance, his admission of certain inculpatory statements made by the defendant, his admission of certain expert testimony, his failure to direct a verdict of not guilty, his allowing a victim impact statement to be read immediately prior to sentencing, and his sentencing White to twenty-one years imprisonment. We affirm.

Around 11:00 p.m. on September 25, 1990, Trooper Wayne Gaugh received a transmission about a pedestrian being on Interstate-95 North in Florence County. Trooper Gaugh began searching the highway and found White at or about the 162-mile marker standing near the roadway.

The trooper approached White. He noted White had a strong odor of alcohol about his person and staggered as he walked. White, who wore a torn, blood-covered shirt, also bled from the shoulder. The back of his right hand showed a "road rash" from an apparent contact with the highway. White told the trooper that he had been in a fight.

Because White needed immediate medical attention, Trooper Gaugh took White to a nearby emergency room at McLeod Regional Medical Center in Florence.

While being examined by medical personnel, White told a nurse that he had attempted to flag down a truck after something happened to the car he had been driving. White claimed a truck that he had attempted to flag down had hit him.

After the doctor treating White ordered a blood sample, White became verbally abusive and threatened hospital personnel. Security officers were called. They placed White in "four-point restraints." These restraints remained about his wrists and ankles the remainder of the night.

Sometime around 2:00 a.m., after he had been in the hospi-

tal for nearly three hours, White told the nurse with whom he had earlier spoken that he had been driving and had been in a car accident. He expressed fear that his passenger, Melvin Terry, who was his brother-in-law, was dead.

Nursing personnel then notified security, who contacted the highway patrol. A state trooper, Robert Austin, immediately came to the hospital. He talked with White sometime between 2:00 and 2:25 a.m.

White told Trooper Austin he had been driving a car to Darlington and a truck had either hit him or run him off the road. He expressed concern to the trooper that "his friend might be out there ... with the vehicle." When the trooper asked White where this had happened, White said he did not know. White also claimed he had been walking along the highway about two hours before Trooper Gaugh picked him up and brought him to the hospital.

Trooper Austin then left the hospital and drove down Interstate 95 to look for White's car.

Around 3:45 a.m., a nurse got a blood sample from White. He had given the hospital a urine sample earlier at about 1:00 a.m. A test using the blood sample revealed a blood alcohol content of 79 milligrams per deciliter (.079). His urine tested positive for benzodiazepine, i.e., valium.

Between 4:00 and 5:00 a.m., White received several injections of sodium pentothal, a sedative.

A passerby found White's car sometime before 7:00 a.m. near the 162-mile marker only a few hundred feet from where Trooper Gaugh had picked White up. The car had traveled down an embankment and had come to rest at the edge of some woods. The car had gone off the road on the left-hand side, entered the median, traveled there for some distance before sliding sideways across the road, and had gone back over onto the right side before leaving the highway and heading down into the woods where it had hit a tree. Branches knocked from the tree in the collision had fallen on the car, partially concealing it.

Troopers found Terry nearby. He was dead. He had sustained fatal chest and neck injuries. His body lay three or four feet from the driver's side of the car.

Around 9:00 a.m., Trooper Austin and Trooper Lloyd Wilkes drove to the hospital to talk with White. Trooper

Wilkes read White his Miranda rights. Afterward, White indicated he wanted to talk to the troopers.

He told the troopers he had been the driver of the car and had been drinking, although he did not remember how much he had had to drink. He also told them he had been "running seventy-five or eighty" miles per hour and he had lost control of the car when a truck veered into his lane, forcing him to leave the lane to avoid colliding with the truck.

When one of the troopers, in response to a question from White about Terry's whereabouts and condition, told White his brother-in-law was dead. White began to tug at the restraints that held him to the bed and he screamed, "Oh, my Lord . . . I've killed him. I've killed him."

A few hours later, the troopers arrested White. They charged him with felony driving under the influence.

■ 1. White asserts the trial court abused its discretion in refusing to grant his motion for a continuance.

White had retained a nurse anesthetist to testify. When the solicitor called the case for trial, however, White learned the nurse anesthetist was on vacation. He moved the court for a continuance so that he could try to get the nurse anesthetist's partner to testify instead.

■ The granting of a motion for a continuance is a matter resting in the trial judge's sound discretion and his ruling will not be disturbed without a clear showing of an abuse of discretion. *State v. Tanner*, 299 S.C. 459, 385 S.E. (2d) 832 (1989). No abuse of discretion occurred here.

In this instance, White did not comply with Rule 7(b), SCR-CrimP. In particular, neither White nor his counsel, as the rule requires, offered his oath that the testimony of the absent witness was material to White's defense, that the motion for a continuance was not intended for delay but was being made because White could not go safely to trial without the absent witness's testimony, and that White had made use of due diligence to procure the testimony of the absent witness. Moreover, White failed to set forth under oath what fact or facts he believed the absent witness would have testified to and the grounds for his belief.

■ 2. White asserts the trial court erred in admitting into evidence the statements that White made to the law enforcement officers. White argues his two statements

were involuntarily given as a matter of law because he was either "in four-point restraints" or was in restraints and had been given sodium pentothal. As we noted above, hospital personnel placed the restraints on White because he was belligerent and White received doses of sodium pentothal between 4:00 and 5:00 a.m. to calm him down.

A confession is not admissible unless it was voluntarily made. *State v. Childs*, 299 S.C. 471, 385 S.E. (2d) 839 (1989). A determination of whether a confession was given voluntarily requires an examination of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed. (2d) 854 (1973); *State v. Franklin*, 299 S.C. 133, 382 S.E. (2d) 911 (1989).

Here, the trial court determined the preponderance of the evidence, considering the totality of the circumstances, showed that both statements, the one made between 2:00 a.m and 2:15 a.m. and the one made around 9:00 a.m., were voluntarily made despite either the presence of restraints or the presence of restraints and White's having earlier administered sodium pentothal. The evidence supports the trial court's findings.

As to the first statement, Trooper Austin, the officer to whom White made the statement, testified that, although White was under restraint when he talked to him shortly before 2:20 a.m., White seemed alert, spoke coherently, and cooperated with him. Also, White, who was not in custody at that time, talked freely and voluntarily with Trooper Austin; and neither Trooper Austin nor anyone else applied any kind of pressure on White to get him to talk.

As to his second statement, which White gave to Troopers Austin and Wilkes about 9:00 a.m., long after hospital personnel had given White injections of sodium pentothal, White, the troopers testified, gave concise answers to their questions. The troopers questioned White only after they had been given authority to talk with him by the charge nurse. Also, they did not question him until after they had given him the Miranda warnings. There is no evidence the questioning was either extended or coercive. White appeared to the troopers to understand what he said to them and seemed to be aware of why the troopers were there. The fact that he had been under medication and was strapped to

his bed was, at best, only a circumstance the trial court was to consider in determining voluntariness. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515 93, L.Ed. (2d) 473 (1986) (holding coercive police activity is a necessary predicate to a finding that a confession is not voluntary and a defendant's mental condition by itself and apart from official coercion does not dispose of the issue of voluntariness).

3. White asserts the trial court erred in allowing the state's forensic toxicologist, who qualified as an expert witness, to give an opinion concerning the rate at which a 150-pound man would eliminate alcohol and in allowing him to testify as to the effects of benzodiazepine when used in combination with alcohol after he admitted that different "benzos" have different effects and he did not know which benzodiazepine White had taken. The trial court committed no error in either regard. White's complaints about the toxicologist's testimony go to the weight of the evidence and not to its admissibility. *See State v. Nathari*, 303 S.C. 188, 399 S.E. (2d) 597 (Ct. App. 1990) (once a witness is qualified as an expert, any question regarding the adequacy of the expert's knowledge goes to the weight of the testimony and not to its admissibility).

4. White asserts the trial court erred in not granting him a directed verdict based on his contention that there was no proof of the corpus delicti of the felony DUI offense other than his own inculpatory statements. This assertion has no merit. Separate and apart from White's inculpatory statements, the evidence outlined above, when viewed in the light most favorable to the State [*State v. Butler*, 277 S.C. 543, 290 S.E. (2d) 420 (1982) ], established proof aliunde of the corpus delicti, albeit circumstantially for the most part. *See* S.C. Code Ann. § 56-5-2945(A) (1991) (the statute creating the offense of felony DUI); *State v Grampus*, 288 S.C. 395, 343 S.E. (2d) 26 (1986) (wherein the supreme court lists the elements of the offense of felony DUI); *State v. Teal*, 225 S.C. 472, 82 S.E. (2d) 787 (1954) ("Corpus delicti" means a specific crime has been committed; a conviction cannot be had on a confession unless corroborated by proof aliunde of the corpus delicti).

The precise questions of whether White drove the motor vehicle in question while under the influence of alcohol or drugs, whether he either did an act forbid-

den by law or neglected a duty imposed by law, and whether his act or neglect caused Terry's death, were matters properly left to the jury. *See State v. Morgan*, 282 S.C. 409, 319 S.E. (2d) 335 (1984) (in a prosecution for driving a motor vehicle while under the influence of alcohol or drugs, the questions of whether a defendant was under the influence and whether he was the driver of the vehicle in question presented issues for the jury).

5. White asserts the trial court erred in allowing the victim's niece to make a victim impact statement immediately prior to White's sentencing. He contends the application in this case of S.C. Code Ann. § 16-3-1550 (1985), which allows victim impact statements to be read at trial, violates his Sixth Amendment right to confront witnesses against him. He also contends the statement was not made available to him, as required by the statute, within an appropriate time period prior to sentencing so that he could rebut the statement. He further asserts the statement was not made available to him, as required by Rule 5, SCRCrimP, in accordance with his request for "[a]ny statements taken from any witness for the State. . . ." Finally, he contends he would have subpoenaed records and presented evidence of the victim's extensive criminal record to balance the prejudicial effect of the statement had he known there would be a victim impact statement made at sentencing.

When the victim's niece prepared to make her statement to the trial court, White's counsel objected generally "for the record . . . [to] testimony or remarks from the victim's family in this case[.]" He made no specific objection on any of the grounds he now asserts on appeal; therefore, they are not preserved. 15 S.C. Juris. *Appeal and Error* § 79, at 141 (1992); *State v. Meyers*, 262 S.C. 222, 203 S.E. (2d) 678 (1974); *Broom v. Southeastern Highway Contracting Co.*, 291 S.C. 93, 352 S.E. (2d) 302 (Ct. App. 1986).

6. White asserts, also for the first time on appeal, that his sentence of twenty-one years for felony DUI is excessive as a matter of law. The General Assembly expressly provided that when death results, as here, a defendant found guilty of felony DUI may be punished by a mandatory fine and by "mandatory imprisonment for not less than one year nor more than twenty-five years. . . ." S.C. Code Ann.

§ 56-5-2945(A)(2) (1991). The term of imprisonment falls below the twenty-five-year limitation.

Affirmed.

CURETON, J., and LITTLEJOHN, Acting J., concur.