THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION HAS NO PRECEDENTIAL
VALUE.  IT SHOULD NOT
BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH
CAROLINA
In The Court of Appeals

 
 
 
 The
 State,        Respondent,
 
 
 

v.

 
 
 
 Christopher James
 Reese,        Appellant.
 
 
 

Appeal From Richland County
G. Thomas Cooper, Jr., Circuit Court Judge

Unpublished Opinion No.
2005-UP-423
Submitted June 1, 2005  Filed June 27, 2005

AFFIRMED

 
 
 
 Acting Deputy Chief Attorney
 Wanda H. Carter, of Columbia,
 for Appellant.
 Attorney General Henry D.
 McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant
 Deputy Attorney General Salley W. Elliott, and Assistant Attorney
 General W. Rutledge Martin, all of Columbia; and Solicitor Warren Blair
 Giese, of Columbia, for Respondent.
 
 
 

PER CURIAM:  Christopher
James Reese appeals from his convictions for armed robbery, two counts of
carjacking, two counts of assault with intent to kill, and one count of
possession of a firearm by a person convicted of a violent crime.  Reese
raises two issues on appeal.  First, he argues the trial court erred in
admitting statements he made to police following his arrest.  Second, Reese
argues the trial court erred in refusing to grant a continuance. We affirm.
FACTS
Reese robbed a bank in Richland County in December of 2000, while
armed with a pistol.  Multiple eyewitnesses saw Reese from the time he
entered the bank until he was placed under arrest.  A security video camera
also recorded the bank robbery.  Reese did not wear a mask or anything to
hide his identity. 
Upon entering the bank lobby, Reese
drew a pistol, and demanded that the teller fill his bag with money.  The
first teller complied, but Reese was unsatisfied with the amount, so he demanded
another teller to put money in the bag.  Reeses demeanor was initially
calm, but when another teller walked in from the back he became nervous and
agitated.  When the additional money was placed into the bag, one of the
tellers put a dye pack into the bag with the money.  Approximately $5,000
was taken.  Reese then turned and ran out the front door with the bag of
money. 
Other eyewitnesses saw Reese flee
through the parking lot with the bag.  Reese ran into a church parking lot
and tried to get into a white SUV waiting there.  One of the tellers at the
bank drive-through window had noticed a white SUV parked in front of the bank
shortly before Reese entered.  The vehicle drove away before Reese could
get inside, and Reese fell back into the parking lot, still holding the bag.
After several unsuccessful
carjacking attempts, Reese pointed his gun at the driver of a pick-up truck
entering a grocery store parking lot.  The driver and his fellow passengers
jumped out of the truck and yielded to Reeses threats.  Reese got in the
pick-up truck and exited the parking lot. 
A police officer arrived on the
scene and one of the men that had been in the truck pointed to Reese as he was
pulling back out onto the highway.  The officer activated her emergency
lights and siren and pursued the truck Reese had carjacked.  During the
high speed chase, he stuck his hand out the window and fired several shots at
the pursuing officer.  Reese also shot twice at another officer he
encountered during the chase. 
Reese eventually lost control of the
truck and crashed.  Reese was arrested, and the gun was retrieved from the
scene.  One of the officers asked Reese for identification, and he told her
he did not have it with him in case he was caught.  
Another police officer arrived
shortly after the accident and talked to Reese before he was placed into the
ambulance.  At that time, Reese appeared shaken up, but coherent and able
to communicate.  However, a paramedic testified that Reese became very
combative and uncooperative in the ambulance.  The paramedic reported that
Reese said things that were illogical.  On cross-examination, the paramedic
testified that it was not unusual for suspects in similar situations to become
combative and resist after they are restrained, and to voice their
displeasure.  The paramedic was able to get Reeses name, social security
number, and date of birth from him, and passed this information along to police.
The investigating officer followed
the ambulance to the hospital and went with Reese into the emergency room. 
They arrived at the hospital at about 4:30 p.m.  The officer again found
Reese responsive and coherent.  At that time Reese was under arrest and
restrained with handcuffs. 
At approximately 4:50 p.m. Reese was
given 25 mg of Phenergan, a sedating medication.  Phenergan generally does
not alter memory, but can cause drowsiness.
The officer read Reese read his Miranda[1] rights at about 5:10 p.m. and took
an oral statement shortly thereafter.  Reese was excited but communicative
during the interview.  The officer testified that during the interview,
Reese responded appropriately to his questions, knew what the officer was
talking about, and gave intelligent and rational responses.  According to
the officer, Reese understood the Miranda warnings and, of his own
volition, agreed to speak with the officer.  The officer did not threaten
or coerce Reese in any way and did not promise him anything. 
Reese then told the officer he met
the driver of the getaway vehicle at a crack house in Greenview.  He
identified the driver as Peanut and said Peanut had loaned Reese the
pistol.  He admitted to the carjackings and remembered shooting a
gun.  He also said Peanut knew Reese was going to rob something but did not
know what.  Reese told the officer he was just trying to get away
because he didnt want to go back to prison.  Reese said he lived for
three things: money, sex, and cocaine.  Reese also gave some background
details about himself, his girlfriend, and the driver of the getaway vehicle.
Reese told the officer that he had
been diagnosed as anti-social and had been prescribed Haldol, an
anti-psychotic drug.  Reese stated he was not taking the prescribed drug
because of the side effects. 
At about 6:00 p.m. Reese was given
an injection of 2 mg of Versed.  Versed is a potent, fast-acting
benzodiazepine that would cause sedation and amnesia for one to three
hours.  The medication was administered so that certain medical procedures
and tests could be performed.
Another officer picked Reese up from
the hospital at about 10:45 that evening.  The charge nurse said Reese was
fit to be physically transported to the jail.  Reese walked out of the
hospital with the officer.  They arrived at the Sheriffs department
about ten minutes later.
The officer advised Reese of his Miranda
rights around 11:00 p.m.  At that time Reese appeared responsive and
coherent.  Reese acknowledged that he understood his rights and signed a
waiver without any promises, threats, or coercion from the officer.  The
officer then took a second statement from Reese.  Reeses demeanor during
the interview was calm and cooperative.  Reese did not appear
confused.  The officer wrote down what Reese said, and Reese signed it
after reviewing it.  The officer testified that he had prior experience
interviewing people with mental problems and he saw nothing to indicate Reese
was suffering any kinds of symptoms at the time the statement was taken. 
This statement also included several
self-incriminating statements.  Reese said he was with an acquaintanceidentified
as Peanutwho supplied Reese with a $20 bag of cocaine. According to Reese,
Peanut was on his way to Charlotte, but he dropped Reese off at the
bank.  Reese admitted he grabbed Peanuts gun out of the glove
compartment and held up the bank.  Reese said some Mexican dudes gave
him the truck.  Reese also admitted to firing the gun at the
officers. 
The following day, the officer who
had taken the first statement from Reese in the emergency room saw Reese
again.  Police were still trying to identify the driver of the getaway
car.  The officer picked Reese up from the detention center and drove him
to the Greenview area.  Once again, Reese was read, and appeared to
understand, his Miranda rights.  His mood was calmer than the day
before, and somewhat somber.  They drove around looking for Peanuts
house, but Reese was unable to identify it.
When they returned to the Sheriffs
office, the officer read Reese his Miranda rights again.  Reese
again appeared to understand, and signed another waiver.  Reese then gave a
third statement to the police.  The content of this statement was
substantially consistent with the first two statements. 
Reese moved prior to trial to
exclude all his statements to the police on the ground that they were not
voluntary.  Donna Schwartz-Watts, a forensic psychiatrist who testified as
an expert witness on Reeses behalf, testified Reese was suffering from a
major mental illness on the date of the crime.   She also believed
Reese was suicidal at that time. 
Dr. William A. Morton, Jr. also
testified that certain medications Reese took at the hospital might have
affected his thinking.  Dr. Morton noted that Reese was in four-point
restraints and handcuffed when the officer took the first statement in the
emergency room.  Reese was administered Phenergan about twenty minutes
before that statement was taken.  Additionally, Reese was given Versed
about five hours before the second statement was taken.  Dr. Morton opined
that a persons ability to make an important decision (whether to give a
statement to police, for example) could be impaired after receiving the
medications.  Upon inquiry by the trial judge, Dr. Morton clarified that
this level of impairment lasted about three hours after administration of
Versed.  However, he stated that the half-life of Versed is two to five
hours. 
Reeses history of mental problems
began shortly after he was committed to the Department of Corrections in
1991.  He was diagnosed with chronic schizophrenia and was admitted to the
psychiatric hospital seven times in eight years.  When the time came for
Reese to be released, the director of Mental Health Services insisted that he be
involuntarily committed to a psychiatric hospital because he was believed to be
a danger to himself or others.  Out of about one thousand inmates released
from the Department of Corrections per year, Mental Health Services insists on
involuntary commitment in only 12 to 15 cases. 
At his first competency hearing in
December of 2001, the experts agreed Reese was not competent to stand
trial.  Reese remained in an extremely psychotic and disorganized state
throughout 2002.  Dr. Schwartz-Watts diagnosed Reese with paranoid
schizophrenia.  She based her conclusion on her observations and medical
records indicating Reese experienced hallucinations, delusions, and
paranoia.  These symptoms included Reese hearing voices, seeing things that
are not real, and exhibiting bizarre behavior. 
At the time of trial, Dr.
Schwartz-Watts and the court-appointed psychiatrist, Dr. Pratap Narayan, agreed
Reese was competent to stand trial.  However, they disagreed about his
criminal responsibility on the date of the crime. 
Dr. Narayan evaluated Reese on
October 12, 2001 and October 30, 2002 and concluded Reese had the ability to
differentiate right from wrong and the capacity to conform his conduct to the
requirements of the law at the time of the alleged offense.
 Prior to the March 2003 trial,
counsel for Reese also moved for a continuance because Reese was not able to
discuss anything in a coherent manner until February of 2003, about a month
before trial.  Dr. Schwartz-Watts believed Reese could be found guilty but
mentally ill, but indicated further she was unable to form an opinion on Reeses
criminal responsibility because the difficulty in interviewing Reese.  Dr.
Schwartz-Watts told the trial judge she needed two more weeks to make the
determination.  However, she was unable to provide assurance that the
determination could be made within that time frame.  Another of Reeses
experts, Dr. Ellen Berg, also testified she was unable to make a determination
about his criminal responsibility and agreed that two more weeks might be
helpful. 
The State opposed the motion for a
continuance, noting the prior delays and taking the position that Reese could be
made available every day until and continuing through the term of the
trial.  The State pointed out that the parties had met and scheduled the
case in January of 2003.  The trial judge denied the motion for a
continuance, but required the State to make Reese available for further
assessment as discussed. 
At trial, Dr. Schwartz-Watts
testified she was unable to form an opinion as to whether Reese was not guilty
by reason of insanity.  She opined that Reese was experiencing delusions on
the day of the crime.  She testified that the delusion caused Reese to
believe he was possessed by a demon, and that only death by the bullet of a
police officer would get rid of it.  She further testified that influences
from movies and rap stars had played into his command hallucinations and
religious delusions.  However, she admitted that Reese understood it is
wrong to rob a bank.  Dr. Schwartz-Watts also testified that Reese has
periods of rational thinking, but noted that a person with schizophrenia may
appear rational when they in fact are not. 
Dr. Narayan also testified at
trial.  Dr. Narayan opined that the mere fact that a person is suffering
from a major mental illness does not exempt them from being held responsible for
a crime.  He testified as to his conclusion that Reese was criminally
responsible for his actions.  Dr. Narayan based his conclusion on two
statements made to police: (1) Reese told the arresting officer that he was not
carrying identification because he knew he might be caught; and (2) Reese told
another officer that he eluded police because he did not want to go back to
prison.  Dr. Narayans report noted that Reeses statements also
established a motive for the crimeto get money to buy more cocaine.  He
testified that although Reese had expressed suicidal ideation, he had never been
known to attempt suicide.  He further saw no evidence that Reese was under
the influence of a hallucination or a delusion on the date of the crime. 
Counsel for Reese renewed the motion
for a continuance after trial.  The trial judge denied the motion. 
The jury found Reese guilty of the various charges and, on appeal, he challenges
the admission of his statements to the police and the denial of his motion for a
continuance. 
LAW/ANALYSIS
I.      
Voluntariness of the Confession
Reese first asserts that the
statements he made to the police must be suppressed because they were not
voluntary.  He maintains the statements were involuntary because he was
suffering from a mental condition, and because he was under the influence of
medications administered at the hospital when they were made.  We find
evidence supporting the trial courts admission of the statements.  See
State v. Myers, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004) (On
appeal, the trial judges ruling as to the voluntariness of the confession
will not be disturbed unless so erroneous as to constitute an abuse of
discretion.). 
Under state law, the determination
of voluntariness requires an examination of the totality of the circumstances,
including the background, experience, and conduct of the accused.  State
v. Franklin, 299 S.C. 133, 138, 382 S.E.2d 911, 914 (1989). 
Voluntariness must be proved by the State by a preponderance of the
evidence.  Id. at 137, 382 S.E.2d at 913.  A confession is not
inadmissible because of a mental deficiency alone.  State v. Hughes,
336 S.C. 585, 594, 521 S.E.2d 500, 505 (1999).  Furthermore, the fact that
a defendant was under medication and in restraints at the time the statement was
taken is not determinative, but is only a circumstance to consider in
determining voluntariness.  State v. White, 311 S.C. 289, 294-95,
428 S.E.2d 740, 743 (Ct. App. 1993)
The trial court found no credible
evidence of police coercion, and the record supports this finding. 
Therefore, Reeses mental condition alone does not compel a finding of
involuntariness.
The officers uniformly testified
that Reese appeared coherent and cooperative when each of the statements was
taken.  The questioning began only after Reese was given his Miranda
warnings.  There was no evidence of confusion or irrationality, and his
answers were responsive to the questions asked.  See Id., 311
S.C. at 294, 428 S.E.2d at 743 (finding a statement voluntary when the defendant
was under medication and in restraints, but was responsive and gave coherent
answers to questions).  In this regard, the record reveals consistency
among the statements and with the testimony of other witnesses.  Although
Reese suffers from chronic schizophrenia, a thought disorder, there was
testimony that he has periods of rationality. 
We do recognize that Reese made the
initial statements after being administered medications at the hospital. 
However, Reese gave the third statement the next day, free from the effects of
the medication.  The content of the third statement was substantially
consistent with the previous statements.  Additionally, the first statement
was made before Reese was given the Versed.  Reeses expert admitted that
Phenergan alone does not alter memory. 
The second statement was taken after
Reese returned from the hospital, five hours after he took the Versed. 
Again, however, Reese appeared alert and coherent, and the content of what he
said was rational and consistent.  The evidence indicates the drugs
influence would have been strongest from two to five hours after he took the
drug.  The statement was taken outside of this window.  Thus, there is
evidence to support the finding that neither Reeses mental disorder nor the
medications were sufficient to render his statements involuntary. 
Finally, even if the statements were
involuntary, the error was harmless.  When guilt has been conclusively
proven by competent evidence such that no other rational conclusion can be
reached, the Court should not set aside a conviction because of insubstantial
errors not affecting the result.  State v. Bailey, 298 S.C.
1, 5, 377 S.E.2d 581, 584 (1989).  The evidence of guilt was
overwhelming in this case.  No circumstantial evidence was needed because
multiple eyewitnesses testified to all the events for which Reese is
charged.  The police officers testified that the purpose of the statements
was to apprehend Reeses accomplice because no further evidence against Reese
was needed.  Therefore, because guilt could be proven even without the
statements, any error in admitting them was harmless. 
II.     
Motion for a Continuance
Reese next argues the trial court
erred in refusing to grant a continuance to allow his experts time to reach a
definite conclusion as to his criminal responsibility.  We disagree. 
The granting of a motion for a
continuance is a matter resting in the trial judges sound discretion and his
ruling will not be disturbed without a clear showing of an abuse of discretion. 
White, 311 S.C. at 293, 428 S.E.2d at 742.
Here, the court-appointed expert
determined that Reese was not insane when he committed the crimes.  Reese
requested a continuance because his experts desired more time to evaluate
him.  However, she could not guarantee a more definite opinion.  We
find no abuse of discretion in denying the request for a continuance.  See
State v. Lewis, 328 S.C. 273, 279, 494 S.E.2d 115, 118 (1997) (holding
that the defendants standoff with police evidenced his sanity, even though
there was evidence the defendant was out of his mind and severely
depressed).
CONCLUSION
We hold that the trial court acted
within its discretion in admitting Reeses statements and denying his motion
for a continuance. 
AFFIRMED.
GOOLSBY, HUFF, and KITTREDGE, JJ.,
concur.

[1]        Miranda v. Arizona,
384 U.S. 436, 86 S.Ct. 1602 (1966).