793 S.E.2d 314

**Shanna KRANCHICK, Respondent,**

**v.**

**STATE of South Carolina, Petitioner.**

**Appellate Case No. 2011–191687**
**Opinion No. 5448**

Court of Appeals of South Carolina.

Heard February 10, 2015
Filed October 26, 2016
Rehearing Denied December 15, 2016

Attorney General Alan McCrory Wilson and Assistant Attorney General Megan E. Harrigan, both of Columbia, for Petitioner.

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Respondent.

MCDONALD, J.:

The State of South Carolina (the State) appeals the post-conviction relief (PCR) court's order granting Respondent Shanna M. Kranchick's application for PCR. The State argues the PCR court erred in determining that Kranchick's trial counsel provided ineffective assistance in failing to object to the State's forensic toxicologist's testimony as to the effects of the marijuana, antihistamines, and cough suppressant found in Kranchick's blood after the accident. We reverse and reinstate Respondent's conviction and sentence.

**FACTS AND PROCEDURAL HISTORY**

At approximately 3:00 p.m. on January 23, 2002, Kranchick lost control of the Ford Taurus she was driving eastbound on Interstate 20 in Northeast Richland County. After swerving off the road, Kranchick overcorrected and collided with the rear of a bobtail truck. The impact caused the truck to spin into the median, over the median guardrail cables, and into the path of an oncoming tractor trailer hauling sand. The smaller truck flipped onto its roof, killing the driver, Gene Croft, at the scene. Croft's passenger and the driver of the tractor trailer were severely and permanently injured in the accident.

On March 20, 2002, the Richland County grand jury indicted Kranchick for one count of felony driving under the influence (DUI) causing death and one count of felony DUI causing great bodily injury. Kranchick's first jury trial resulted in a mistrial.[1] Following a second jury trial, Kranchick was convicted and sentenced to thirteen years of imprisonment for felony DUI causing death and fifteen years of imprisonment, suspended upon the service of five years' probation, for felony DUI causing great bodily injury.[2] The PCR court subsequently granted Kranchick's application for post-conviction relief, finding "that the toxicologist was not sufficiently qualified to testify about the effects of drugs or when they are consumed." At issue is whether the PCR court erred in finding Kranchick's trial counsel ineffective for failing to object to a portion of the toxicologist's testimony.

## ANALYSIS

■ "This Court will uphold the findings of the PCR judge when there is any evidence of probative value to support them, and it will reverse the PCR judge's decision when it is controlled by an error of law." *McHam v. State*, 404 S.C. 465, 473, 746 S.E.2d 41, 45 (2013) (quoting *Suber v. State*, 371 S.C. 554, 558–59, 640 S.E.2d 884, 886 (2007)). In order to establish a claim of ineffective assistance of counsel, an applicant must prove (1) counsel failed to render reasonably effective assistance under prevailing professional norms and (2) counsel's deficient performance prejudiced the applicant's case. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### I. Deficient Performance

■ At Kranchick's trial, forensic toxicologist Gregory Rock testified that he received a Bachelor of Science degree in medical technology from the University of South Carolina and additional training through the South Carolina Law Enforcement Division's (SLED's) toxicology program, "which consists

---

1. Fifth Circuit Public Defender Douglas Strickler represented Kranchick in the first trial. Kranchick was represented primarily by an Assistant Public Defender (trial counsel) in the second trial.

2. These sentences are consecutive to an unrelated armed robbery sentence of twelve years' imprisonment.

of about a year-long training where [he] under[went] book work[,] oral testing[,] and written testing." Rock further testified that he worked as a forensic toxicologist at SLED for approximately two and one-half years following his training and that SLED is accredited by the American Society of Crime Lab Directors. Without objection, the trial court qualified Rock as an expert "in the field of forensic toxicology."

Rock did not testify as to his education, experience, or knowledge relating to the physical or mental effects of drugs on the human body, and trial counsel did not object when he subsequently testified as to the effects of the "significant amount of [marijuana] metabolite" and "very significant" amounts of cough suppressant and antihistamine found in Kranchick's blood following the accident.

At the PCR hearing, Strickler [3] testified that he "didn't hear anything in the testimony that qualified [Rock] in regard to the psychopharmacological effects of marijuana or the other [drugs] in this case." Thus, PCR counsel asserted trial counsel should have objected to Rock's testimony about the effects of the drugs on Kranchick as "outside the bounds of [Rock's] expertise." The State argued trial counsel was not deficient in failing to object because the definition of "toxicology" specifically "allows for the effects of drugs." *See Toxicology, Black's Law Dictionary* (5th ed. 1979) (defining "toxicology" as "[t]he science of poisons; that department of medical science which treats poisons, their effects, their recognition, their antidotes, and generally of the diagnosis and therapeutics of poisoning").

We find there is evidence in the record to support the PCR court's determination that "the State presented insufficient qualifications for the toxicologist to testify concerning the mental or physical effects of drugs on a person." *See State v. Priester*, 301 S.C. 165, 167, 391 S.E.2d 227, 228 (1990) (concluding the trial court erred in allowing a lab technologist, who admitted "he had no training whatsoever in determining the effect of alcohol upon the human system" to testify regarding the effects of drugs and alcohol); *cf. State v. White*, 311 S.C. 289, 295, 428 S.E.2d 740, 743 (Ct. App.1993) (concluding the trial court did not err in allowing the forensic toxicologist, who

---

3. Trial counsel was not called to testify at the PCR hearing as she now lives out of state.

was qualified as an expert witness, to give an opinion concerning the effects of benzodiazepine when used in combination with alcohol after he admitted that different "benzos" have different effects and that he did not know which benzodiazepine the defendant had ingested).

Thus, under our deferential standard of review, we affirm the PCR court's holding that trial counsel's failure to object to the testimony exceeding Rock's presented qualifications fell below an objective standard of reasonableness. However, this does not conclude our analysis because we must determine whether Kranchick suffered any prejudice as a result of the admission of this testimony.

## II. Prejudice

The State argues that even if the PCR court correctly determined trial counsel was deficient in failing to object to this portion of Rock's testimony, Kranchick cannot demonstrate the required resulting prejudice because the record establishes Rock was qualified to testify about the effects of the drugs. Moreover, there was overwhelming evidence of Kranchick's guilt. The State further contends that trial counsel's failure to object to the portion of Rock's testimony exceeding his qualifications, as presented at trial, had no reasonable impact on the outcome of the case.

### A. Forensic Toxicologist Qualifications and Testimony

█ Rock explained that his analysis of Kranchick's urine and blood samples indicated she had ingested large quantities of marijuana as well as cough suppressant and antihistamine (collectively, cold medicine) prior to the accident. Rock tested both urine and blood samples; when he did not find any alcohol in Kranchick's blood, he screened her urine for legal and illegal drugs. As the analysis revealed the presence of marijuana metabolite, antihistamine, and cough suppressant, Rock tested her blood to determine specific quantities.

Rock found a "significant amount of [marijuana] metabolite" in Kranchick's blood, which he explained was "more than the normal amount that we typically see." Specifically, the blood testing revealed sixty micrograms of marijuana metabolite per liter of blood. Based on the amount of marijuana metabolite

found in her blood, Rock opined that Kranchick had ingested marijuana "within the last eight hours." Rock testified that although the metabolite itself does not impair a person's ability to drive, a person's ability to drive would be impaired by the amount of marijuana that must have been ingested to produce such a significant amount of metabolite. On cross-examination, Rock admitted his testing would have revealed the presence of THC—the primary mind-altering ingredient in marijuana—if the marijuana were still active in Kranchick's system. Rock also admitted that Kranchick could have ingested the marijuana nine to fourteen hours prior to the incident and up to twenty-four hours prior to the incident if she were a "chronic user" who smoked marijuana daily.

In addition to the marijuana metabolite, Rock found "very significant" amounts of cough suppressant and antihistamine in Kranchick's blood. Testing revealed 0.5 milligrams of antihistamine per liter of Kranchick's blood, 1.3 milligrams of methorphan (cough suppressant) per liter of blood, and 0.24 milligrams of methorphinan (cough suppressant) per liter of blood. Rock testified that when used for therapeutic reasons, cold medicine is "normally seen or taken at very low dosages, approximately anywhere from 0.01 to 0.05 [milligrams]." However, "[i]n this case, they were extremely high, almost twenty to thirty times that level." Rock explained that a person might take twenty to thirty doses of cold medicine accidentally or they may take it to get high. Rock further explained that the possible effects of cold medicine at these levels include euphoria, hallucinations, sedation, and muscle relaxation. With regard to the effects from the antihistamine alone, Rock stated, "You would tend to have possibly hallucinogenic effects. You would have a sedative effect. You would have a very [ ] muscle relaxing effect." Rock testified that ingesting twenty to thirty times the normal amount of either cough suppressant or antihistamine would impair a person's ability to drive.

Finally, Rock opined that the combination of marijuana and cold medicine in these amounts would "build on each other. They have what's called an additive effect." He testified that with such a combination of drugs "you're going to get, not necessarily twice the effect, but you have more effect [than] just one alone." Rock concluded that a person taking these drugs in these amounts could not safely operate an automo-

bile, and that Kranchick "would have definitely been impaired." Trial counsel did not object to Rock's testimony as to the effects of marijuana combined with excessive doses of cold medicine.

In *State v. Martin*, which also involved a defendant convicted of felony DUI resulting in death, this court concluded the trial court did not err in allowing a forensic toxicologist to testify as to the effects of drugs and alcohol on the body. 391 S.C. 508, 512–13, 706 S.E.2d 40, 42 (Ct. App. 2011). Specifically, forensic toxicologist Brandon Landrum discussed the effects of alcohol on an individual at several blood alcohol concentration (BAC) levels, explained the effects of marijuana and Xanax, and opined that an individual with a 0.167 BAC combined with marijuana and Xanax could not safely operate a motor vehicle. *Id.* at 514, 706 S.E.2d at 43.

Landrum explained a forensic toxicologist analyzes "blood, urine, biological[,] and non-biological samples" for the presence of alcohol, drugs, and poisons. After analyzing these samples, forensic toxicologists interpret the results for coroners, police officers, and courts. Interpreting these results involves an examination of how different levels of drugs and/or alcohol cause an individual to act or respond under their influence.

Landrum also explained the extent of his training and education regarding the effects of alcohol and drugs on the body. Landrum received in-house training at [SLED], which involved studying the effects of drugs and alcohol on the body. Landrum's clinical chemistry rotation during his medical technology training included a section where he studied the impairing effects of drugs and alcohol. Landrum also attended classes at the drug recognition evaluation school at the police academy .... [, which] involved studying the behavior of individuals clinically dosed with certain amounts of alcohol.

Landrum further explained the difference between forensic toxicology and pharmacology. According to Landrum, pharmacology involves testing for the presence or absence of drugs or alcohol and examining the interaction between different drugs and drugs and alcohol. Forensic toxicology

"takes it a step further" and determines the level of impairment for courts.

*Id.* at 513–14, 706 S.E.2d at 42–43 (first alteration in original).

On appeal, the *Martin* defendant argued the witness's training and expertise as a forensic toxicologist were insufficient to permit him to render an opinion regarding the effects of drugs and alcohol on the body. *Id.* at 514, 706 S.E.2d at 42. This court disagreed, finding the trial court did not abuse its discretion in permitting Landrum to so testify. *Id.* at 514–15, 706 S.E.2d at 43. Specifically, the *Martin* court relied upon the witness's testimony as to his education and experience, as well as his explanation that a forensic toxicologist tests samples for the presence of alcohol and drugs and then interprets the findings to determine an individual's degree of impairment. *Id.* at 515, 706 S.E.2d at 43. The court further noted the defendant's objections to the toxicologist's qualifications went to the weight of his testimony and not its admissibility. *Id.* at 515–16, 706 S.E.2d at 43–44. Finally, the court held that even if the trial court erred in permitting the testimony about the effects of the drugs and alcohol upon the driver, the defendant was not prejudiced because the State was entitled to an inference that the defendant was under the influence of alcohol as his BAC was 0.167 percent. *Id.* at 515, 706 S.E.2d at 43 (citing S.C. Code Ann. § 56-5-2950(G)(3) (Supp. 2012), which provides that in a prosecution for felony DUI, a BAC of greater than .08 percent gives rise to an inference that the defendant was under the influence of alcohol).

Likewise, in *State v. White*, this court found the circuit court did not err in allowing a "state forensic toxicologist" to give an opinion "concerning the rate at which a 150–pound man would eliminate alcohol and in allowing him to testify as to the effects of benzodiazepine when used in combination with alcohol." 311 S.C. 289, 295, 428 S.E.2d 740, 743 (Ct. App. 1993). There, the defendant contended the testimony was improper because the witness "admitted that different 'benzos' have different effects and he did not know which benzodiazepine White had taken." *Id.* This court disagreed, determining that defendant's objections to the toxicologist's testimony went to the weight of the evidence and not its admissibility. *Id.* at 295, 428 S.E.2d at 743 (explaining that once a witness is qualified as an expert, any question regarding the adequacy of the

expert's knowledge goes to the weight of the testimony and not to its admissibility (citing *State v. Nathari*, 303 S.C. 188, 195, 399 S.E.2d 597, 602 (Ct. App. 1990))).

Although not specifically presented, Rock's education and experience are equivalent to the qualifications of the *Martin* forensic toxicologist. Here, the PCR court found, and Kranchick conceded, that "[Rock] was sufficiently qualified to testify regarding general toxicology as [a] 'person or scientist who analyzes biological specimens for the presence or absence of alcohol, drugs or other poisons that may be present.' " Thus, it is likely that objections to Rock's further testimony concerning the effects of the drugs would have been futile because the objections would have addressed the weight of the evidence, rather than its admissibility.

Moreover, even if trial counsel had successfully objected, thus limiting Rock's testimony to the mere presence of the drugs found in the blood testing, Kranchick cannot establish the probability of a different result at trial. Kranchick does not assert that Rock's testimony concerning the results of her blood testing was improper; thus, even if the trial court had limited Rock's testimony to an opinion as to the presence of the drugs—as opposed to their effect—there is no reasonable probability of a different result at trial. The jury would still have heard evidence that Kranchick had twenty to thirty times the normal levels of antihistamine and cough suppressant—and significantly high levels of marijuana metabolite—in her system at the time of the accident.

## B.   Other Evidence of Impairment

■   Lance Corporal Jeffrey Baker of the South Carolina Highway Patrol confirmed Kranchick was the driver at the time of the accident. When Baker first approached Kranchick at the scene, she was sitting in the driver's seat of the Ford Taurus but denied that she had been driving. Once Baker interviewed the other occupants of the Taurus, however, Kranchick admitted she was the driver. Baker testified Kranchick was confused about the direction in which she was traveling; appeared mellowed and disoriented; smelled of marijuana; and swayed and was unsteady on her feet. Kranchick refused to perform some of the field sobriety tests Officer Baker

attempted to administer; she failed a horizontal gaze nystagmus test and a vertical gaze test; and her eyes were "glassy" and "bloodshot."[4]

Baker opined Kranchick was "under the influence of something" due to her reactions to his questions, her appearance, her demeanor, her swaying, and her unsteadiness on her feet. Baker further explained that based on his interaction with Kranchick at the scene, he believed her ability to drive was impaired. *See State v. Ramey*, 221 S.C. 10, 13–14, 68 S.E.2d 634, 635 (1952) (stating "a lay witness may testify whether or not in his opinion a person was drunk or sober on a given occasion on which he observed him" and "the weight of such testimony is for determination by the jury").

Other witnesses testified as to the erratic movement of the Taurus prior to the accident. Daniel Sharp, the injured passenger in decedent Croft's truck, first saw the Kranchick vehicle in the far left lane, in the gravel between the median and the roadway. Because the bobtail had a number of rearview mirrors, Sharp could see that the Taurus behind the truck was "losing it." Tracy Proctor, who witnessed the accident, also observed "a car completely out of control."

Sergeant Robert Lee of the South Carolina Highway Patrol's Multi–Disciplinary Accident Investigation Team (MAIT Unit) testified that no environmental factors contributed to the crash. Lee further testified that there was no indication of braking by Kranchick's vehicle until its yaw marks began in the area of the rumble strip next to the median.[5] According to Sergeant James Day, another accident reconstructionist with the MAIT Unit, Kranchick "went so far over that she lost

---

4. Trial counsel cross-examined Baker about whether the accident itself could have rendered Kranchick unsteady and disoriented. Baker testified that emergency personnel put a Band–Aid on Kranchick's arm for an airbag burn, and he gave her some time to compose herself before attempting the field sobriety tests.

5. A rumble strip is the strip that alerts a driver when he or she begins to run off the road. A yaw mark is made by an out-of-control vehicle when the rear tire out-tracks the front tire. Here, the yaw marks started at the rumble strip and headed back to the center of the roadway. A yaw cannot occur in a braking situation. There were no skid marks at the scene to indicate emergency braking by Kranchick's vehicle prior to the accident.

control of her vehicle at the rumble strip and she over-corrected, causing it to go out of control."

In light of the overwhelming evidence that Kranchick was impaired at the time of the accident, we do not believe trial counsel's failure to object to Rock's testimony prejudiced the outcome of her case. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *Huggler v. State*, 360 S.C. 627, 634–35, 602 S.E.2d 753, 757 (2004) ("[G]iven the witnesses' testimonies on direct provided overwhelming evidence that sexual abuse did in fact occur, counsel's failure to object to the admission of the written statements did not prejudice the outcome of Respondent's case."); *State v. Goode*, 305 S.C. 176, 179–80, 406 S.E.2d 391, 393–94 (Ct. App. 1991) (holding evidence supported a finding that defendant was under the influence of alcohol at the time of an accident despite the lack of evidence concerning the defendant's BAC, where the road was straight with clear visibility, the defendant had a strong odor of alcohol on his breath, alcohol was found in his blood, and there was expert testimony that the accident occurred in the oncoming vehicle's lane, with the defendant speeding and not braking before impact).

Even without Rock's testimony "concerning the mental or physical effects of drugs" on Kranchick, we believe the State provided more than enough other evidence for a reasonable jury to conclude Kranchick was impaired at the time of this tragic accident. Had trial counsel objected to this testimony, the State would have further questioned Rock regarding his education, experience, and knowledge relating to the physical and mental effects of drugs on the human body. Because we find Rock's qualifications are equivalent to those of the forensic toxicologist in *State v. Martin, supra*, his testimony regarding the effects of marijuana metabolite and cold medicine would have been appropriate and within his scope of expertise. Therefore, we hold the PCR court erred in determining that "but for counsel's unprofessional errors," the result of Kranchick's trial would have been different.

Accordingly, the decision of the PCR court is **REVERSED.**

LOCKEMY, C.J., and SHORT, J., concur.