706 S.E.2d 40

**The STATE, Respondent,**

v.

**William Conrad MARTIN, Appellant.**

**No. 4788.**

Court of Appeals of South Carolina.

Heard Sept. 15, 2010.

Decided Feb. 3, 2011.

Robert T. Williams, Sr., and Benjamin A. Stitely, of Lexington, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliot, and Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

LOCKEMY, J.

William Conrad Martin appeals his conviction for felony driving under the influence (DUI) resulting in death. Martin argues the trial court erred in admitting certain expert testimony and declining to grant a directed verdict on felony DUI. We affirm.

## FACTS

Martin was indicted for felony DUI resulting in death after the pickup truck he was driving collided with the vehicle that seventy-two-year-old Rugy Stone was riding in as a passenger. The collision caused Stone's vehicle to flip over and slide upside down into a ditch alongside the road. Stone was injured in the accident and transported to the emergency room at Palmetto Health Richland.[1]

---

1. TJ Shealy, the driver of the vehicle and Stone's grandson, was uninjured.

At trial, the State proffered the testimony of Dr. Eric Brown and Dr. Raymond Bynoe who attended to Stone in the emergency room. Upon her arrival, Stone was in "severe shock," although she was conscious and complaining of chest and upper abdominal pain. Stone was also able to explain she had diabetes, hypertension, and a heart problem.

An initial examination revealed Stone had "extremely low" blood pressure and difficulty breathing. Brown and Bynoe performed an emergency intubation, inserting a breathing tube into Stone's mouth and connecting Stone to an artificial respirator. An examination of Stone's midsection revealed multiple rib fractures, and her ribs were "free-floating." A computerized tomography (CT) scan revealed bleeding in Stone's chest cavity from lacerated blood vessels behind her fractured ribs. Brown and Bynoe evacuated the blood via a chest tube. An examination of Stone's back indicated she suffered an acute compression fracture of her T8 vertebra in her upper back and two other fractures in her lower back. Despite these fractures, Stone was able to move her arms and legs.

Brown and Bynoe stabilized Stone, and she remained in intensive care on an artificial respirator. Over the next two weeks, several unsuccessful attempts were made to remove Stone from the artificial respirator. Eventually, Stone received a tracheostomy for long-term use of artificial respiration. Stone also developed pneumonia, a blood infection, and a urinary tract infection. Bynoe explained the pneumonia and blood infections were likely the result of receiving blood transfusions during her treatment. According to Bynoe, Stone's diabetes further complicated recovery because patients with diabetes have a difficult time regulating blood sugar after transfusions. During this time, Stone's body also had difficulty maintaining proper levels of nourishment. According to Bynoe, the blood infections, malnutrition, and complications with Stone's diabetes were caused by the injuries she sustained in the accident.

Approximately two weeks after the accident, Bynoe transferred Stone to Intermedical Hospital, which specializes in the long term care of patients with serious and prolonged health problems, and referred her to Dr. Daniel Love for treatment.

Stone presented at Intermedical with a staph infection of the lung, a urinary tract infection, and an "unusual bacterial infection." The ability of Stone's immune system to fight these infections was compromised by the complications from her diabetes. Further, Stone was unable to process food properly. Trauma from the accident damaged her liver and prevented it from manufacturing proteins needed for digestion and also impaired the muscular motion of her intestinal tract.

Two months after the accident, Stone's breathing improved and she was able to breathe without the artificial respirator. However, Stone's back injuries had not healed, and she began to experience paralysis and eventually became paralyzed. Shortly thereafter, Stone's breathing worsened and did not improve with the use of a breathing mask. Love informed Stone and her family that he believed placing her back on the artificial respirator would only prolong her illness, and she would likely not survive her injuries and resulting complications. After consulting with her family, Stone chose not to be placed on the artificial respirator and soon after passed away.

Love testified that respiratory failure was the immediate cause of Stone's death, but "the respiratory failure was a consequence of [her] original injuries." Love explained the complications Stone suffered were a result of the injuries she sustained in the accident, and the injuries and complications combined together to cause Stone's death. Ultimately, the jury found Martin guilty of felony DUI resulting in death. The trial court sentenced Martin to fifteen years' imprisonment and imposed a $10,100 fine. This appeal followed.

## ISSUES ON APPEAL

1. Did the trial court err in allowing opinion testimony from Brandon Landrum, which fell outside the realm of his qualifications as a forensic toxicologist?
2. Did the trial court err in declining to direct a verdict on felony driving under the influence resulting in death?

## LAW/ANALYSIS

### I. Expert Testimony

Martin argues the trial court erred in allowing Brandon Landrum to testify to the effects of drugs and alcohol on

the body. Specifically, Martin maintains Landrum's training and expertise as a forensic toxicologist are insufficient to allow him to give his opinion regarding the effects of drugs and alcohol on the body. We disagree.

The qualification of a witness as an expert is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Caldwell*, 283 S.C. 350, 352, 322 S.E.2d 662, 663 (1984); *State v. Goode*, 305 S.C. 176, 177–78, 406 S.E.2d 391, 392–93 (Ct.App.1991). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or a factual conclusion that is without evidentiary support." *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006).

Pursuant to Rule 702, SCRE, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Before a witness is qualified as an expert, the trial court must find (1) the expert's testimony will assist the trier of fact, (2) the expert possesses the requisite knowledge, skill, experience, training, or education, and (3) and the expert's testimony is reliable. *State v. White*, 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009). Once a witness is qualified as an expert, continued objections to the amount or quality of the expert's knowledge, skill, experience, training, or education go to weight of the expert's testimony, not its admissibility. *Id.*

The State proffered Landrum as an expert in forensic toxicology. Landrum explained a forensic toxicologist analyzes "blood, urine, biological[,] and non-biological samples" for the presence of alcohol, drugs, and poisons. After analyzing these samples, forensic toxicologists interpret the results for coroners, police officers, and courts. Interpreting these results involves an examination of how different levels of drugs and/or alcohol cause an individual to act or respond under their influence.

Landrum also explained the extent of his training and education regarding the effects of alcohol and drugs on the body. Landrum received in-house training at the South Car-

olina Law Enforcement Division (SLED), which involved studying the effects of drugs and alcohol on the body. Landrum's clinical chemistry rotation during his medical technology training included a section where he studied the impairing effects of drugs and alcohol. Landrum also attended classes at the drug recognition evaluation school at the police academy in Columbia, South Carolina. Landrum explained these classes involved studying the behavior of individuals clinically dosed with certain amounts of alcohol.

Landrum further explained the difference between forensic toxicology and pharmacology. According to Landrum, pharmacology involves testing for the presence or absence of drugs or alcohol and examining the interaction between different drugs and drugs and alcohol. Forensic toxicology "takes it a step further" and determines the level of impairment for courts. The trial court qualified Landrum as an expert in forensic toxicology.

Landrum testified his testing revealed Martin's blood alcohol concentration (BAC) was 0.167 percent. Over Martin's objection to Landrum's "qualifications," Landrum explained the effects of alcohol on an individual at several BAC levels. Landrum also testified regarding elimination, or the rate alcohol is processed and eliminated by the body, over Martin's objection to Landrum's "expertise." Martin also tested positive for marijuana and alprazolam (Xanax). Without objection, Landrum explained the effects of marijuana and Xanax and the synergistic effects of the combination of alcohol, marijuana, and Xanax. Landrum opined an individual with a 0.167 BAC combined with marijuana and Xanax could not safely operate a motor vehicle.

Here, Martin challenges Landrum's qualifications to testify regarding the effects of drugs and alcohol.[2] We find the trial court properly qualified Landrum as an expert and allowed him to testify regarding the effects of drugs and alcohol. In illuminating his qualifications, Landrum explained a forensic

---

2. Martin does not allege the trial court failed to determine whether Landrum's testimony was reliable or that it would assist the trier of fact. See *White*, 382 S.C. at 274, 676 S.E.2d at 689 ("In the discharge of its gatekeeping role, a trial court must assess the threshold foundational requirements of qualifications and reliability and further find that the proposed evidence will assist the trier of fact.").

toxicologist tests samples looking for the presence of alcohol, drugs, and poisons and then interprets those tests to determine an individual's level of impairment. Landrum also testified he completed several training and educational experiences which examined the effects of drugs and alcohol. Notably, Landrum explained he had been qualified as an expert in forensic toxicology on nine other occasions and each time testified regarding the effects of drugs and alcohol. Landrum further explained forensic toxicology differs from toxicology in that it determines an individual's level of impairment for courts. Accordingly, Landrum possessed the requisite experience, training, and education to be qualified as an expert in forensic toxicology who could testify regarding the effects of drugs and alcohol.

Martin's reliance on *State v. Priester* for the proposition that Landrum was not qualified to testify regarding the effects of drugs and alcohol is unavailing. 301 S.C. 165, 391 S.E.2d 227 (1990). In *Priester,* the supreme court held the trial court erred in allowing a lab technologist, who admitted "he had no training whatsoever in determining the *effect* of alcohol upon the human system," to testify regarding the effects of drugs and alcohol. *Id.* at 168, 391 S.E.2d at 228. Here, Landrum testified he possessed the exact type of training the supreme court found lacking in *Priester;* accordingly, *Priester* is distinguishable and lends Martin no support.

Finally, even if the trial court erred in allowing Landrum's testimony regarding the effects of drugs and alcohol, Martin was not prejudiced. The State was entitled to an inference Martin was under the influence of alcohol because his BAC was 0.167 percent. *See* S.C.Code Ann. § 56–5–2950(G)(3) (Supp.2009) (providing that in a criminal prosecution for felony DUI, a blood alcohol concentration of greater than 0.08 gives rise to an inference the defendant was under the influence of alcohol).

For the foregoing reasons, we hold the trial court did not abuse its discretion in qualifying Landrum as expert witness in forensic toxicology and allowing him to testify regarding the effects of the drugs and alcohol. Because Landrum was properly qualified as an expert witness, Martin's subsequent objections to the amount of Landrum's qualifications went to

the weight of his testimony, not its admissibility. See *White*, 382 S.C. at 274, 676 S.E.2d at 689.

## II. Directed Verdict

■ Martin contends the trial court erred in declining to direct a verdict of not guilty. According to Martin, Stone's choice to terminate medical care was an intervening cause of death. We disagree.

■ "When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A defendant is entitled to a directed verdict when the [S]tate fails to produce evidence of the offense charged." *Id.* "When reviewing a denial of a directed verdict, this [c]ourt views the evidence and all reasonable inferences in the light most favorable to the [S]tate." *Id.* "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury." *Id.* at 292–93, 625 S.E.2d at 648.

Section 56–5–2945(A) of the South Carolina Code (2006)[3] provides:

> A person who, while under the influence of alcohol, drugs, or the combination of alcohol and drugs, drives a vehicle and when driving does any act forbidden by law or neglects any duty imposed by law in the driving of the vehicle, which act or neglect proximately causes ... death to a person other than himself, is guilty of a felony.

"A defendant's act may be regarded as the proximate cause if it is a contributing cause of the death of the deceased." *State v. Dantonio*, 376 S.C. 594, 605, 658 S.E.2d 337, 343 (Ct.App. 2008). However, "[t] he defendant's act need not be the sole cause of the death, provided it is a proximate cause actually contributing to the death of the deceased." *Id.*

In *State v. Patterson*, this court considered whether the trial court erred in declining to charge the jury on the law of proximate cause because the victim died after being removed

---

**3.** The events in question occurred on July 29, 2007; accordingly, we apply section 56–5–2945 as it existed at that time.

from an artificial respirator and a feeding tube. 367 S.C. 219, 231, 625 S.E.2d 239, 245 (Ct.App.2006). Patterson's girlfriend was taken to the hospital after he severely beat her with a blunt instrument. *Id.* at 223, 625 S.E.2d at 241. She was treated and placed on life support; however, her prognosis was poor. *Id.* Nine days later she was removed from life support and died soon after. *Id.* at 223–24, 625 S.E.2d at 241. The court noted the beating caused the victim's death and concluded "[u]nder these facts, the removal of life support cannot be considered an independent intervening cause capable of breaking the chain of causation triggered by the defendant's wrongful actions." *Id.* at 235, 625 S.E.2d at 247.

Here, Martin's contention that Stone's decision to forgo further use of the artificial ventilator is sufficient to relieve him of liability for her death as a matter of law is without merit. Martin drove the vehicle that collided with Stone's vehicle. Stone sustained severe internal injuries to her lungs and liver in the accident. She was unable to breathe without the use of an artificial respirator and to properly digest feedings. Stone's ribs were broken in multiple locations and "free floating" in her mid-section, and her back was fractured in three places. During treatment, Stone developed several interrelated complications from the emergency surgery and blood transfusions required to save her life. Although the immediate cause of death was listed as respiratory failure, Love explained the initial injuries Stone suffered and the complications from treatment combined together to cause her death.

Under these facts, Stone's decision to forgo further use of the artificial respirator cannot be an intervening cause of death sufficient to relieve Martin of liability. Although Stone died after declining further use of the artificial ventilator, the evidence establishes Stone died as a result of the injuries she suffered in the accident caused by Martin. Martin's actions were a contributing cause of death and therefore, a proximate cause of Stone's death. Accordingly, because direct evidence exists reasonably tending to prove Martin proximately caused Stone's death, we hold the trial court properly denied Martin's motion for a directed verdict.

518

## CONCLUSION

The trial court properly qualified Landrum as an expert witness and allowed him to testify regarding the effects of drugs and alcohol. Because direct evidence exists reasonably tending to prove Martin proximately caused Stone's death, the trial court properly denied Martin's motion for a directed verdict. Accordingly, the decision of the trial court is

**AFFIRMED.**

SHORT and THOMAS, JJ., concur.