SHORT, J.:
Paula Reed Rose appeals her convictions of third-degree arson, filing a false police report, burning personal property to defraud an insurer, and making a false insurance claim to obtain benefits for fire loss, for which the trial court sentenced her to a cumulative term of five years' home incarceration with five years' probation. On appeal, Rose argues the trial court erred by (1) refusing to direct a verdict of acquittal on all charges when the State failed to present substantial circumstantial evidence of her *531 guilt, (2) qualifying Investigator Benjamin Cannon as an expert in the origin and causes of fires, and (3) permitting the expert testimony of Investigator Charles Gonzalez regarding the use of his accelerant detection canine at the scene. We affirm.
FACTS
On the morning of July 27, 2012, Paula Rose called 911 to report a burglary. During the call, Rose stated three men were in her garage threatening her and demanding she open a gun safe. While on the phone with the 911 dispatcher, Rose heard a strange noise. She stepped out of her bedroom and realized a wicker couch on her back porch was on fire. The responding authorities found Rose outside worried about her pets who were still inside the home. Rose was covered in soot and wore jeans, a black shirt, and open-toed shoes. The firemen deduced there were two fires-one on the back porch and one on the front porch; however, the only active fire was in the rear of the home.
Shortly after the responders extinguished the fire, Investigator Randy Morgan arrived. The only potential traces of the alleged burglars were some footprints and disposed latex gloves[1] near the front and back porches. Investigator Morgan testified nothing was stolen from the property, but both of the gates and the garage were found open.
During Investigator Cannon's preliminary investigation, he found a red gas can on the front porch and a yellow gas can on the back porch. He noted "the aroma of gasoline on the front and prob[ably] kerosene or diesel-type on the back porch." Investigator Cannon subsequently called his colleague Investigator Gonzalez and his accelerant detection canine Misty to the scene. Misty alerted to multiple areas on the front and back porch.
After taking Rose's statement, Investigator Morgan met with Investigators Cannon and Gonzalez to compare their findings. Based upon various oddities and inconsistencies, such as the location of the fires in relation to the alleged burglary; discrepancies between Rose's 911 call and victim statement; the superficial damage to the safe; the lack of stolen items; and Rose's calm, unaffected demeanor, all three investigators felt the case needed further investigation. Thereafter, they returned to the scene to further investigate the garage and interior of the home.
Describing the damage to the safe, Investigator Cannon testified there were "a dozen or so marks" on the "upper right hand corner" and a few marks around the dial. Investigator Cannon explained the paint appeared chipped but there was no substantial damage to the safe. Looking for an item potentially used by the assailants to attempt to gain entry to the safe, the investigators found a small hatchet sitting on a shelf in the garage that appeared to be undisturbed. The investigators noted the hatchet had paint chips on the blade. While examining Rose's bedroom, Misty alerted to a pair of slippers.
Before trial, Rose moved to exclude evidence of Misty's alerts and the testing results arising therefrom, arguing the use of a canine in this context was unreliable. Relying upon Florida v. Jardines ,[2] the trial court ultimately denied Rose's motion, finding testimony regarding Misty's alerts would be admissible if the State established the proper foundation by showing the dog was properly certified through a recognized program. Rose renewed this objection at trial, and the trial court overruled the objection, later stating,
[A]t the end of the hours of preliminary testimony we had yesterday I don't feel the need to have any further [argument]. I know what I'm gonna hear ... my ruling will be ... that as long as the appropriate foundation is laid on the admission of the testimony about the ... dog then [it will] be allowed....
At the close of the State's case, Rose moved for a directed verdict on all charges, arguing the State failed to present substantial circumstantial evidence of her guilt. Although the trial court noted its concern regarding the fraudulent insurance claim charge, the court ultimately denied Rose's motion as to *532 all indictments. The jury found Rose guilty of all charges as indicted, and the trial court sentenced her to five years' home incarceration with five years' probation. This appeal followed.
STANDARD OF REVIEW
"In criminal cases, an appellate court sits to review errors of law only. Therefore, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous." State v. Banda , 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006). Thus, "this [c]ourt is limited to determining whether the trial court abused its discretion." State v. Edwards , 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). Accordingly, "[t]his [c]ourt does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial court's ruling is supported by any evidence." Id.
LAW/ANALYSIS
I. Directed Verdict
Rose argues the trial court erred in denying her motion for a directed verdict as to all charges because the
State failed to show substantial circumstantial evidence tending to prove her guilt. Rose asserts the evidence the State presented fails to rise above vague suspicion. We disagree.
"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." State v. Weston , 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "A defendant is entitled to a directed verdict when the state fails to produce evidence of the offense charged." Id. "On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State." State v. Stanley , 365 S.C. 24, 41, 615 S.E.2d 455, 464 (Ct. App. 2005). "If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury." State v. Mollison , 319 S.C. 41, 46, 459 S.E.2d 88, 91 (Ct. App. 1995). "Nevertheless, a[n appellate] court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." State v. Bennett , 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016). "[T]he lens through which a[n appellate] court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." Id. "Accordingly, in ruling on a directed verdict motion where the State relies on circumstantial evidence, th[is] court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." Id. at 237, 781 S.E.2d at 354.
In South Carolina, a person is guilty of third-degree arson if she "wilfully and maliciously ... sets fire to, burns, or causes a burning which results in damage to a building or structure." S.C. Code Ann. § 16-11-110(C) (Supp. 2017). Section 16-11-130 of the South Carolina Code (2015) provides:
Any person who ... wilfully and with intent to injure or defraud an insurer sets fire to or burns or causes to be burned or ... aids, counsels, or procures the burning of any ... personal property of any kind, whether the property of himself or of another, which is at the time insured by any
person against loss or damage by fire is guilty of a felony....
Additionally, a person is guilty of a felony if she:
wilfully and knowingly presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim , for the payment of a fire loss ... upon any contract of insurance or certificate of insurance which includes benefits for such a loss, or prepares, makes, or subscribes to a false or fraudulent account , certificate, affidavit, or proof of loss, or other documents or writing, with intent that such documents may be presented or used in support of such claim....
S.C. Code Ann. § 16-11-125 (2015) (emphasis added).
Subsection 16-17-722(A) of the South Carolina Code (2015) provides that "[i]t is unlawful for a person to knowingly file a false police report."
In the case at bar, Rose called 911, alleging three men in her garage were threatening *533 her and seeking entry to her gun safe. During the call, Rose informed the dispatcher she heard a "crackling" noise and subsequently realized a wicker couch on her back porch was on fire. When Benjamin Temple, a good samaritan, stopped to inspect the voluminous smoke he saw from the road, Rose never mentioned the burglary or cause of the fire. In fact, when Temple asked if anyone else was inside the home, Rose replied only her dog remained inside. Further, the investigating authorities were unable to find the three men, and nothing was stolen from the property. Additionally, Investigators Cannon, Morgan, and Gonzalez found the damage to the gun safe to be superficial with most of the shallow marks on the upper right side rather than near the dial. The investigators testified they found the hatchet likely used to make the markings on a shelf that seemed undisturbed. At trial, trace evidence expert Megan Fletcher testified the paint chips found on the hatchet and safe either originated from the same item or an item containing the "same physical and chemical characteristics."
In addition to the fire debris on the front and back porches, Misty also alerted to a pair of Rose's slippers in the bedroom, which were not the shoes Rose wore during the fire. Fletcher testified the slippers tested positive for ignitable liquids. Additionally,
Fireman Brandon Barwick testified that in September after the fire at her home, Rose came to the Wade Hampton Fire Department in search of burn records for her property. According to Barwick, Rose stated she wanted the records to provide an explanation for why Misty alerted to her slippers. She explained she previously burned leaves on her property while wearing them. However, Fletcher testified ignitable liquids vaporize quickly, so the products found on the tested items would last "less than a few days," and, according to the Forestry Commission's records, the last controlled burn on the Rose property occurred on May 29-a couple of months before the fire.
Fletcher further testified samples from the jeans and shirt Rose wore during the fire also tested positive for ignitable liquids. Fletcher testified that "for [her] to be able to determine that a[n] ignitable liquid was found, ... a liquid would have had to have been deposited on [the collected] items." Fletcher explained the ignitable liquids would have to be in liquid form to be deposited onto an item. Fletcher clarified "ignitable liquids are not found in smoke from a fire scene," and therefore, an ignitable liquid cannot be deposited onto an item, such as clothing, in a gaseous state. Finally, although the State Farm insurance policy only listed Homer as the named insured, Nicholas Gregory, the assigned State Farm representative, testified Rose participated in the claim process, including providing information about how the fire occurred. See § 16-11-125 ("Any person who wilfully and knowingly presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim , for the payment of a fire loss ... upon any contract of insurance or certificate of insurance which includes benefits for such a loss ... or subscribes to a false or fraudulent account ... used in support of such claim, is guilty of a felony." (emphasis added) ).
Viewing the evidence in the light most favorable to the State, we find a jury could reasonably deduce Rose fabricated the burglary and caused the fires for the purposes of receiving insurance benefits. See Stanley , 365 S.C. at 41, 615 S.E.2d at 464 ("On appeal from the denial of a directed verdict in a criminal case, an appellate court must view the evidence in the light most favorable to the State."). Accordingly, the trial court properly refused to direct a verdict in Rose's favor. See Bennett , 415 S.C. at 237, 781 S.E.2d at 354 ("[I]n ruling on a directed verdict motion where the State relies on circumstantial evidence, th[is] court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt."); Mollison , 319 S.C. at 46, 459 S.E.2d at 91 ("If there is any direct or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the issues were properly submitted to the jury.").
II. Expert Qualification
Rose argues the trial court abused its discretion in allowing Investigator Cannon to *534 testify as an expert in arson cause and origin. Specifically, Rose maintains the State failed to demonstrate that, at the time of the fire, Investigator Cannon possessed the requisite knowledge, skill, experience, training, or education to allow for his opinion testimony. Rose additionally contends Investigator Cannon's expert testimony was unreliable because he failed to comply with the National Fire Protection Association's guidelines during his investigation of the fires. We disagree.
"The qualification of a witness as an expert is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." State v. Martin , 391 S.C. 508, 513, 706 S.E.2d 40, 42 (Ct. App. 2011). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or a factual conclusion that is without evidentiary support." State v. Price , 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006).
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. "The expertise, reliability, and the ability of the testimony to assist the trier of fact are all threshold determinations to be made prior to the admission of expert testimony, and generally, a witness's expert status will be determined prior to determining the reliability of the testimony." State v. Tapp , 398 S.C. 376, 388, 728 S.E.2d 468, 474-75 (2012). "There is no exact requirement concerning how knowledge or skill must be acquired." State v. Henry , 329 S.C. 266, 274, 495 S.E.2d 463, 467 (Ct. App. 1997). Further, "[t]here is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury." Id. at 273, 495 S.E.2d at 466. "Once a witness is qualified as an expert, continued objections to the amount or quality of the expert's knowledge, skill, experience, training, or education go to weight of the expert's testimony, not its admissibility." Martin , 391 S.C. at 513, 706 S.E.2d at 42.
We find the trial court properly qualified Investigator Cannon as an expert in arson cause and origin. Although Investigator Cannon possessed less than a year's worth of experience in the arson field at the time of the Rose investigation, the trial court properly accounted in its analysis the breadth of Investigator Cannon's experience and training possessed at the time of trial. At the time of his qualification, Investigator Cannon testified he had previously investigated between eighty and eighty-five arson cases, including cases similar to the Rose investigation, and had previously been qualified as an arson expert in the Thirteenth Circuit. In regards to his education and training, Investigator Cannon testified he had attended a two-week, eighty-hour class at the National Fire Academy in Maryland that was specifically designed for learning the origin and causes of fires and also included a fire pattern certification course. Investigator Cannon testified he also attended "a basic fire investigation course" at the Criminal Justice Academy and had taken 130 hours of "online certified fire investigative classes." Additionally, Investigator Cannon testified he takes approximately forty hours of continuing education classes per year. See Henry , 329 S.C. at 274, 495 S.E.2d at 467 ("There is no exact requirement concerning how knowledge or skill must be acquired."). Accordingly, the State sufficiently demonstrated Investigator Cannon possessed the requisite experience and training to testify as an expert in arson origin and causes.
Further, Rose's claim that Investigator Cannon's expert testimony was unreliable because he failed to comply with the National Fire Protection Association's guidelines is unavailing. Rose never raised this issue to the trial court prior to its qualification of Investigator Cannon; therefore, Rose failed to preserve this issue for appellate review and any objections subsequent to Investigator Cannon's qualification went to the accorded weight of his testimony. See State v. Dunbar , 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003) ("In order for an issue to be preserved for appellate review, it must have been raised *535 to and ruled upon by the trial [court]."); id. at 142, 587 S.E.2d at 694 ("A party may not argue one ground at trial and an alternate ground on appeal."); see also Martin , 391 S.C. at 513, 706 S.E.2d at 42 ("Once a witness is qualified as an expert, continued objections to the amount or quality of the expert's knowledge, skill, experience, training, or education go to weight of the expert's testimony, not its admissibility.").
Based on the foregoing, the trial court did not abuse its discretion in qualifying Investigator Cannon as an expert in arson cause and origin. See id. ("The qualification of a witness as an expert is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion."); Henry , 329 S.C. at 273, 495 S.E.2d at 466 ("There is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury....").
III. Admissibility of Accelerant Detection Canine Evidence
Rose argues the trial court abused its discretion in allowing Investigator Gonzalez's expert testimony concerning the use of his accelerant detection canine Misty at the scene. Specifically, Rose challenges the testimony detailing Misty's alert to Rose's slippers and the forensic testing results arising therefrom. Rose contends the trial court erred in allowing this testimony because the State failed to establish that (1) the use of an accelerant detection canine was reliable and (2) Investigator Gonzalez possessed the requisite knowledge, training, and skill to properly handle an accelerant detection canine and assess its alerts. We disagree.
Preliminarily, the State contends Rose failed to properly preserve this issue for appellate review. However, we find
Rose's pretrial motion in limine and subsequent objections at trial sufficiently safeguarded the issue for our review.
"A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." State v. White , 382 S.C. 265, 269, 676 S.E.2d 684, 686 (2009). Although our appellate courts have not yet addressed the admissibility of canine detection evidence in the context of arson investigations, we find our jurisprudence concerning the admissibility of dog tracking evidence instructive. In White , our supreme court held all "[n]on[-]scientific expert testimony must satisfy Rule 702, both in terms of expert qualifications and reliability of the subject matter." 382 S.C. at 273, 676 S.E.2d at 688. However, "[t]here is no formulaic approach for determining the foundational requirements of qualifications and reliability in non-scientific evidence." State v. Chavis , 412 S.C. 101, 108, 771 S.E.2d 336, 339 (2015). "The expertise, reliability, and the ability of the testimony to assist the trier of fact are all threshold determinations to be made prior to the admission of expert testimony, and generally, a witness's expert status will be determined prior to determining the reliability of the testimony." Tapp, 398 S.C. at 388, 728 S.E.2d at 474-75.
Investigator Gonzalez testified he and Misty had worked on 142 fire scenes together prior to trial. Regarding the extent of his training and education, Investigator Gonzalez testified he had worked in law enforcement for twenty-one years and had been a part of Greenville County's arson unit since 2005. Investigator Gonzalez testified he received specialized training through the National Fire Academy in Maryland and held numerous certifications in the field of arson investigation. Regarding Misty's qualifications as an investigative canine, Investigator Gonzalez testified he began "training with her from the beginnin[g] of the imprint [on ignitable liquids] to the end [of] certification." Investigator Gonzalez testified that in January 2011, he and Misty took a six-week accelerant detection training course in Alabama where she was exposed to "a minimum of sixteen different ignitable liquids." While Misty learned to search for and detect various accelerants, Investigator Gonzalez testified he "learned how to know when she is alerting on ignitable liquids and when she isn't alerting ... and how to handle her in workin[g] in fire scenes." After completing the course in Alabama, Investigator Gonzalez testified he took Misty to Austin, Texas where they engaged *536 in "actual fire scene training" with the State Fire Marshall's Office. After becoming additionally certified in Texas, Investigator Gonzalez testified he brought Misty back to South Carolina. Since the original certifications in 2011, Investigator Gonzalez testified he and Misty have both re-certified "every year in the Fall." He explained Misty "certifies each year with the ... North American Police Work Dog Association," which is a recognized organization for certification of police canines. Investigator Gonzalez clarified that both "the canine and the handler" re-certify each year. Investigator Gonzalez explained that for Misty to receive her certification, she can neither miss nor falsely alert to any of the tested ignitable liquids. According to Investigator Gonzalez, Misty has not failed any certification process since receiving her original certification in March 2011. He further testified Misty had never falsely alerted in any case.
Pursuant to the framework established in White , we find the State sufficiently demonstrated (1) Investigator Gonzalez possessed the requisite knowledge, training, and skill under Rule 702, SCRE, to qualify as an expert in "the handling of accelerant detection canines" and (2) Misty's alerts were reliable. See White , 382 S.C. at 273, 676 S.E.2d at 688 ("Non[-]scientific expert testimony must satisfy Rule 702, both in terms of expert qualifications and reliability of the subject matter.").
Regarding Rose's challenge to Misty's reliability based on potential crime scene contamination, we find evidence in the record supports the trial court's admission of Misty's alerts. See Banda , 371 S.C. at 251, 639 S.E.2d at 39 ("[A]n appellate court sits to review errors of law only. Therefore, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous."); id. ("The same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases.").
Accordingly, the trial court did not abuse its discretion in allowing Investigator Gonzalez's expert testimony concerning Misty's alerts at the scene and the subsequent forensic test results arising therefrom. See White , 382 S.C. at 269, 676 S.E.2d at 686 ("A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion.").
CONCLUSION
Accordingly, the decision of the trial court is
AFFIRMED.
THOMAS and HILL, JJ., concur.

SLED analysts were unable to lift fingerprints from the gloves, and the DNA test results were inconclusive.

569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013).