# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Aneisha Shaire Young, Appellant.

Appellate Case No. 2018-000525

———————————

Appeal From Jasper County
Carmen T. Mullen, Circuit Court Judge

———————————

Opinion No. 5795
Submitted November 2, 2020 – Filed January 27, 2021

———————————

**AFFIRMED**

———————————

Chief Appellate Defender Robert Michael Dudek, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Susannah Rawl Cole, all of
Columbia; and Solicitor Isaac McDuffie Stone, III, of
Bluffton, all for Respondent.

———————————

**HEWITT, J.:** Aneisha Shaire Young appeals her convictions for murder, attempted murder, and possessing a weapon during the commission of a violent crime. Young argues a former cellmate's testimony should not have been admitted because the State did not disclose the testimony's contents before trial. She also argues text messages should have been excluded and that the trial court erred in qualifying a

SLED Agent as an expert in cell phone location analysis. We respectfully disagree with each of these arguments. Thus, we affirm.

**FACTS**

Devonte Freeman was shot and killed late one night in April 2016 near the Siesta Hotel in Jasper County. Wrenshad Anderson—Freeman's brother—was with him when he died.

Anderson met Freeman at the Siesta earlier that evening and recalled seeing Young at the hotel, which he believed was unusual because she did not usually spend time there. He remembered Young was wearing all black. According to Anderson and other witnesses, he and Freeman recently had disagreements and fights over money with Young, Eric Darien, and Keandre Frazier.

While Anderson and Freeman were at the Siesta, Keith Horton, the hotel's property manager, received a call from an unidentified female, calling from a blocked number, notifying him that Freeman was at the property. Horton knew Freeman had been placed on trespass notice for having a gun on the premises a few weeks earlier. Horton then went looking for Freeman, and Young approached him to tell him where to find Freeman. After that, Horton recalled seeing Young and two other men leave the Siesta in a car. Horton found Freeman and Anderson, asked them to leave, and they agreed to leave peacefully.

According to Anderson, he and Freeman were walking from the Siesta to another location when they heard leaves rustling, followed by gunshots. Anderson recalled he and Freeman started running down the path when Freeman was shot and fell to the ground. Anderson said the shooters, two figures dressed in all black, continued to fire at them even after Freeman was shot.

When officers arrived, they found Anderson on the ground holding Freeman, who had been shot in the back of the head. Anderson initially indicated he believed Darien and Frazier were the perpetrators, but he also believed Young was involved.

Anderson said he called Darien and Young after the shooting and confronted them, but they said they were in the "country." He recalled Young contacted him repeatedly the next day and denied her involvement.

Officers recovered .9 millimeter and .22 caliber shell casings from the crime scene. They also interviewed people who were at the Siesta the night of the shooting and

confirmed Frazier was playing cards at the hotel when the shooting occurred. Young gave a statement to police, but police were unable to confirm her alibi. Officers also obtained search warrants for various cell phones.

A Jasper County grand jury indicted Young for Freeman's murder, Anderson's attempted murder, and possessing a weapon during the commission of a violent crime. At trial, the State offered the testimony of multiple witnesses, including the testimony of two of Young's cellmates from the detention center—Marie Powell and Debbie Spann—who both testified Young told them she killed Freeman and wanted to kill Anderson because he was the only witness. The State also introduced incriminating text messages between Young and others sent around the time of the shooting and in the days immediately afterwards. Additionally, SLED Agent Eric Grabski testified as an expert witness in cell phone location analysis, stating Young's cell phone used cell phone towers on the night of the murder in a manner that contradicted Young's statements to police. Young did not testify or present any evidence in her defense.

The jury found Young guilty of all counts. The trial court sentenced Young to thirty years' imprisonment for murder, a consecutive term of ten years for attempted murder, and a concurrent term of five years for the weapons charge. This appeal followed.

## ISSUES

1. Did the trial court err in allowing Young's former cellmate, Debbie Spann, to testify against her when the State did not share the contents of Spann's testimony before trial?

2. Did the trial court err in admitting text messages because they were not trustworthy under Rule 803(6), SCRE (pertaining to business records), and unduly prejudicial under Rule 403, SCRE?

3. Did the trial court err in qualifying SLED Agent Eric Grabski as an expert in cell phone location analysis?

## SPANN'S TESTIMONY

Young claims the State's failure to provide a synopsis of Spann's testimony violated Rule 5, SCRCrimP, and her due process rights by failing to provide sufficient notice, resulting in a "trial by ambush."

There was no question the State identified Powell as a potential witness. Powell and Spann were both on the pre-trial witness list. According to the colloquy in the record, the State had difficulty locating Spann and had not served her with a subpoena at the start of the trial. The State did not disclose a summary of Spann's testimony to Young prior to trial.

On the trial's third day, the State told the court it had located Spann that morning and served her with a subpoena. Young objected to Spann testifying, arguing it was a due process violation because Spann's testimony caught her by surprise and the State did not provide a synopsis of what Spann would say. The trial court encouraged Young's counsel to talk to Spann before she testified and see if that would "cure" any prejudice from the lack of notice. Although it is fair to say the trial court forecasted Spann would likely be allowed to testify, the court did not announce a ruling to that effect. Four witnesses testified after that, including Powell (another of Young's former cellmates, as already mentioned). Spann testified next. Young did not object when Spann took the stand.

The failure to contemporaneously object to Spann's testimony means any argument about that testimony is not preserved. *See State v. Johnson*, 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005) ("To preserve an issue for review there must be a contemporaneous objection that is ruled upon by the trial court."). Although Young initially objected to Spann's testimony, she did not renew her objection prior to Spann testifying. *See Doe v. S.B.M.*, 327 S.C. 352, 356, 488 S.E.2d 878, 880 (Ct. App. 1997) ("The failure to make an objection at the time evidence is offered constitutes a waiver of the right to object.").

Even so, and even if we believed there was an abuse of discretion in admitting the testimony (we express no opinion whatsoever on that question), it is evident Spann's testimony was cumulative to Powell's testimony. *See State v. Haselden*, 353 S.C. 190, 197, 577 S.E.2d 445, 448–49 (2003) (recognizing the admission of improper evidence is harmless when the evidence is merely cumulative of other evidence). Young admitted her involvement in Freeman's murder to both women. Just like Spann, Powell said Young admitted her co-defendant had the .9 millimeter gun, she had the .22 caliber gun, and she planned to tell police the co-defendant killed Freeman. Just like Spann, Powell recalled Young asked how much Powell's boyfriend would charge to kill Anderson. And just like Spann, Powell testified Young admitted she killed Freeman and expressed interest in killing Anderson because he was the only witness.

## TEXT MESSAGES

Young argues the trial court erred in admitting multiple text messages into evidence because the State could not prove Young sent the text messages. Young also claims the messages were confusing, had multiple meanings, were racially provocative, and were thus unfairly prejudicial. We disagree.

There was a preliminary showing that some of the messages were Young's own statements. Young gave police a cell phone number she admitted was hers, but she disavowed the text messages by claiming she broke and lost that phone. Officers got the data associated with the phone number from the phone's service provider—Verizon. This data included incoming and outgoing text messages. At trial, the State sought to enter the text messages (both incoming and outgoing) into evidence.

At trial, the State called a Verizon representative to authenticate certain aspects of the text messages. The Verizon representative verified the accuracy of the phone numbers sending and receiving the messages, the date and time the messages were sent, and the content of the messages. The testimony also made clear that this witness could not and would not testify about the identity of who sent the messages.

The trial court gave specific reasons for admitting the various messages. For some, the court noted Young had identified one of the phone numbers as hers and that there was accordingly evidence from which the jury could conclude some of the messages were admissions. The court allowed other messages to show Young was in contact with a phone identified with Eric Darien (another suspect)—a fact Young denied. The court allowed another group of messages not for their truth, but because Young's response was arguably incriminating. For example, there was no testimony about who sent Young messages, shortly after the shooting, which stated "I see you hittin [expletive] [with] that fire welcome to family fool." Young's responses—"Already ... delete this text NOW" and "Who told u?"—suggested she was involved. The Verizon representative read the messages into the record.

Young's arguments about undue prejudice are not preserved. Although Young initially objected to the text messages based on relevance and undue prejudice, the objection completely lacked specificity. Young never argued why the text messages were irrelevant or prejudicial, and the trial court never ruled upon the objection. *See State v. Bailey*, 253 S.C. 304, 310, 170 S.E.2d 376, 379 (1969) ("It is well settled that an objection, to be good, must point out the specific ground of the objection, and that if it does not do so, no error is committed in overruling it." (quoting 53 Am. Jur. *Trial* § 137 (1945))); *State v. Millings*, 247 S.C. 52, 53, 145 S.E.2d 422, 423

(1965) ("[A]n objection couched in terms no more specific than 'highly prejudicial' is too general."). Instead, Young's arguments at trial centered entirely on the trustworthiness of the text messages as business records under Rule 803(6), SCRE.

We also respectfully reject Young's business records argument. The trial court did not rule the text messages were admissible solely under the business records rule. After establishing that the records were reliable, the court ruled several of the messages were admissions because Young had identified the cell phone number as hers in a recorded interview with police. The jury might not (and apparently did not) believe Young's subsequent statements that she broke and lost her phone. We also agree the incoming text messages to Young's phone were not hearsay because they were not admitted for their truth, but because Young's responses were incriminating.

The fact that the State could not identify who sent some of these messages does not affect the question of whether Verizon's records of the text messages are business records. *See* Rule 803(6), SCRE ("A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness; *provided, however,* that subjective opinions and judgments found in business records are not admissible."). Young's arguments do not call into question the trustworthiness of Verizon's record keeping or the authenticity of the text messages.

## CELL PHONE LOCATION EXPERT

Young argues the trial court erred in qualifying SLED Agent Grabski as an expert in cell phone location analysis because he "admitted the program and method of his cell phone analysis had never been peer reviewed" and he had never been qualified as an expert witness in state court prior to this case. We disagree.

The proffer at trial established Agent Grabski had been a member of the SLED surveillance and intelligence unit for two years and had performed cell phone location analysis in over 200 cases. It also revealed Agent Grabski was trained by the FBI's Cellular Analysis Survey Team and received additional training from private entities. Agent Grabski also said he received extensive training in pen register track and trace techniques.

Agent Grabski's testimony centered on a map he developed showing how Young's cell phone "pinged" off different cellular towers the night of Freeman's murder. He explained that he and his team log general location information after they receive cell phone data from a service provider. These maps show which cellular tower, and which sector on the tower, received a signal from the phone. Agent Grabski explained the cell tower and sector reliably illustrate the general area a phone is located.

The proffer disclosed there are limitations on how cell phone location data can be used. For example, Agent Grabski noted precise longitude and latitude data from cellular carriers can be untrustworthy. Still, he said there is no legitimate questioning of the historical data identifying which cell phone tower (and which sector) a mobile phone engages during a call. He further explained this tower and sector information is a reliable way to get a general idea of a phone's movements. Then, over several pages of testimony, Agent Grabski walked through the data showing Young's phone began the night on Hilton Head Island, traveled to the general area in Ridgeland where the shooting occurred, and then returned to Hilton Head after 2 a.m.

Grabski acknowledged he did not know the individual who developed the cell phone "mapping" software and did not know if the software had been peer reviewed. He also acknowledged he had not testified as an expert witness before.

We see no abuse of the trial court's discretion in qualifying Agent Grabski as an expert in this sort of cell phone location analysis. *See Graves v. CAS Med. Sys., Inc.*, 401 S.C. 63, 74, 735 S.E.2d 650, 655 (2012) ("The qualification of a witness as an expert is within the discretion of the circuit court, and we will not reverse absent an abuse of that discretion."). It is evident from Agent Grabski's proffer that his testimony would help the jury understand the cell phone location data and Young's movements on the night of the shooting. It is equally evident that Agent Grabski has the requisite knowledge, skill, experience, and training, and his testimony was reliable. *See State v. Martin*, 391 S.C. 508, 513, 706 S.E.2d 40, 42 (Ct. App. 2011) ("Before a witness is qualified as an expert, the trial court must find (1) the expert's testimony will assist the trier of fact, (2) the expert possesses the requisite knowledge, skill, experience, training, or education, and (3) [] the expert's testimony is reliable."); *Hall v. Clarendon Outdoor Advert., Inc.*, 311 S.C. 185, 188, 428 S.E.2d 1, 2 (Ct. App. 1993) ("To be competent as an expert, a witness by reason of study or experience or both must possess such knowledge or skill in a business, profession, or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.").

The fact that Agent Grabski acknowledged he did not know the individual who developed the software that helped him produce the location "map" and did not know if the software had been peer reviewed does not tend to show he lacked the requisite knowledge, training, or experience, or that his testimony was unreliable. This court recently examined the same sort of testimony, on the same subject, at length. *See State v. Warner*, 430 S.C. 76, 83–89, 842 S.E.2d 361, 364–67 (Ct. App. 2020) (finding similar testimony regarding cell phone location analysis and related expert testimony reliable and admissible).

In fact, other jurisdictions have also determined this method of using cell phone records to determine a cell phone's location "is a well-accepted, reliable methodology." *See, e.g., United States v. Lewisbey*, 843 F.3d 653, 659 (7th Cir. 2016). The fact that this was Agent Grabski's first time testifying as an expert does not render his testimony unreliable. *See Warner*, 430 S.C. at 87, 842 S.E.2d at 366 ("The number of times a court has qualified a witness as an expert or found a method reliable will almost never be relevant to the trial court's Rule 702 task, as what matters is the method's endorsement by the relevant field, not the bench.").

**CONCLUSION**

Based on the foregoing, Young's convictions are

**AFFIRMED.**[1]

**THOMAS and HILL, JJ., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.